**SECOND DIVISION**
**MILLER, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**July 2, 2021**

# In the Court of Appeals of Georgia

A21A0412. LOCKHART v. BLOOM et al.

PIPKIN, Judge.

In this medical malpractice case, Connie Lockhart sued Glenn Bloom, M.D., an emergency room physician, and his employer, Cherokee Emergency Physicians, LLC, (collectively "Appellees") alleging that Dr. Bloom improperly placed an intravenous line in her leg, resulting in its amputation.[1] In several related enumerations of error, Lockhart argues that the trial court erred in granting Appellees' motion for a directed verdict and in denying her motion for new trial on that basis We agree, and for the reasons explained below, we now reverse and remand the case for a new trial.

---

[1] Lockhart also sued other providers involved in her care. The case against those defendants continued below resulting in a verdict for the plaintiff and those defendants are not parties to this appeal.

A directed verdict is authorized only when there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. A grant of directed verdict is a ruling that the evidence and all reasonable deductions there from demand a particular verdict. It is illogical to say such a finding will be upheld if there is any evidence to support it. A grant of directed verdict can be upheld only where we determine that all the evidence demands that verdict. This requires a de novo review… . It is correct to say that a directed verdict cannot be granted if there is any evidence to support a contrary verdict, but there cannot be "some evidence" that all the evidence demands a particular verdict.

(Citations and punctuation omitted.) *Moore v. Singh*, 326 Ga. App. 805, 805 (755 SE2d 319) (2014).

Among other things, a plaintiff in a medical malpractice action must demonstrate a violation of the applicable medical standard of care. *Arnold v. Turnbow*, 357 Ga. App. 533, 536 (1) (848 SE2d 698) (2020). This must be established through expert testimony. OCGA § 24-7-702 (c); *Dubois v. Brantley*, 297 Ga. 575, 580-581 (2) (775 SE2d 512) (2015).

There is little dispute about the salient facts of this case. While Lockhart was a patient at Northside Hospital-Cherokee, she was treated by Dr. Bloom; the

physician mistakenly placed a catheter in Lockhart's femoral artery instead of her femoral vein. Lockhart was transferred to the ICU and by the time the mistake had been detected, the medications that were administered though the catheter accumulated in her leg and destroyed tissue; ultimately resulting in an amputation of her leg. The case proceeded to trial at which Lockhart introduced the testimony of Eric Gluck, M.D. to establish the standard of care for inserting a femoral catheter, the procedure conducted by Dr. Bloom. Without objection, Dr. Gluck was tendered as an expert in critical care medicine. Dr. Gluck is not an emergency room physician, but testified that he had been board certified in critical care medicine for 27 years and had experience placing central venous catheters in the femoral region, where Lockhart's catheter was placed. Dr. Gluck testified that, at the time of trial, he "runs" the ICU at the hospital where he worked in Chicago and was chairperson of the critical care committee which sets policies and procedures for critical care departments at the hospital, which includes the emergency department. Dr. Gluck trained in New York and Utah, has practiced medicine in Connecticut and Illinois, and he testified at trial that he was familiar with the standard of care in placing a femoral catheter, which, he said, is the same whether the procedure is completed by an ER physician, general practitioner, or critical care physician. According to Dr. Gluck, the standard of care

for inserting a femoral catheter requires the physician to confirm that the catheter was placed into its intended location, which can be done in four different ways: (1) by drawing blood from the catheter and observing the color or sending the blood sample to the lab to identify the sample as arterial blood or venous blood; (2) transduction which, involves specialized equipment to measure pressure; (3) evaluating for pulsatility, which involves differentiating between the higher pressure blood flow of arteries compared to the low pressure. non-pulsating flow of veins; and (4) using ultrasound to visually confirm placement.

Dr. Gluck further detailed how a femoral catheter is placed and how a physician can identify when it has not been placed in its intended location. Dr. Gluck opined that Dr. Bloom violated the standard of care when he did not confirm that the femoral catheter was placed in Lockhart's femoral vein rather than her femoral artery.[2]

Cross examination of Dr. Gluck focused on the fact that he was not an emergency room physician, and this was the basis of Appellees' subsequent motion for directed verdict. Appellees specifically cited to the following testimony:

---

[2] Dr. Bloom acknowledged that he placed the catheter in the wrong blood vessel but contends that, because he had no reason to suspect that the catheter was misplaced, he did not need to take additional steps to confirm placement.

Q. When is the last time you placed a femoral central line in the emergency department, you, by yourself?
A. It would be years.
Q. How many years?
A. A very long time, maybe 15, 18 years.
Q. 15,18 years ago since you even placed a line in the emergency department. Do you place them in the ICU?
A. Yes, I do.
...
Q. You did not do an emergency medicine residency, did you?
A. No
Q. You don't know if they teach emergency medicine residents all across the country that they're supposed to verify the placement of a line in the emergency department, do you?
A. No, I just know they teach it at Swedish Covenant,[3] so I do not know if it's a national standard or just something we do at Swedish.
Q. You do not know if that's a national standard taught emergency medicine doctors, do you?
A. No.

Upon further examination Dr. Gluck testified:

Q. When was the last time you did place a femoral line?
A. Probably four or five months ago, but that was me placing the line. On a daily basis I stand over the shoulders of my fellows and residents who are placing lines in the intensive care unit under much more emergent circumstances than existed in this particular case.
Q. When was the last time you stood over the shoulder of one of your fellows and residents who was placing a femroal catheter, a femoral line?
A. Last week.
Q. Are you confident that you understand the standard of care as it applies to placing the femoral lines, regardless of the geographic location within the hospital?

---

[3] Swedish Covenant Hospital in Chicago, Illinois is the hospital where Dr. Gluck practiced.

5

A. Yes.

After resting their case, Appellees moved for directed verdict on the grounds that Lockhart's sole standard of care expert was not qualified to offer expert testimony on the standard of care for placing a femoral catheter in the emergency room.

In granting Appellees' motion for directed verdict, the trial court found that Dr. Gluck's testimony regarding the standard of care for the relevant procedure was "equivocal" and did not meet the requirements of OCGA §§ 24-7-702 (b) (2) and (b) (3). The court noted that Dr. Gluck "was unable to state that he knew what practices were being taught as the national standard of care" and that he "did not identify the standard of care applicable in Georgia or in an emergency department setting," ultimately concluding that he was unqualified to establish the standard of care to be utilized by Dr. Bloom as an emergency room physician.

1. Appellant argues that it was error to grant a directed verdict because Dr. Gluck's testimony was in the record.

A directed verdict may only be granted "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions

6

therefrom, shall demand a particular verdict[.]" OCGA § 9-11-50 (a). After Appellees' motion for directed verdict, the trial court ruled that Lockhart failed to provide competent expert testimony to establish the standard of care owed by Dr. Bloom.[4] The trial court's decision was largely based on the fact that Dr. Gluck was not an emergency room physician and provided conflicting testimony regarding his knowledge of the standard of care.

Although *Jones v. Chatham County* involves a tax appeal, in light of the strong procedural similarities, we find it instructive. 270 Ga. App. 483 (606 SE2d 673) (2004). After a jury trial on the valuation of his real property, Jones appealed, arguing, among other things, that the testimony of the appraiser, who testified as an expert for the tax assessor, was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and should have been excluded. This Court rejected Jones' argument because he did not object

---

[4] In its order denying Lockhart's motion for new trial, the trial court states "[u]pon the [c]ourt's ruling that Dr. Gluck was not qualified, there remains in Plaintiff's case-in-chief no further evidence to establish that standard of care of Dr. Bloom's alleged violation thereof." The trial court did not find that his testimony was insufficient to establish the standard of care or breach, but rather that Dr. Gluck was unqualified to offer that testimony under OCGA § 24-7-702.

at the time of the appraiser's testimony, but instead argued it as the basis of his motion for a directed verdict following the appraiser's testimony.

> Because Jones did not contemporaneously object to the overall admission of [the] expert testimony, he has forfeited his right to insist the testimony be excluded from evidence. Moreover, the record as it exists at the close of evidence controls whether the trial court should direct a verdict. It follows that a motion for directed verdict or for j.n.o.v. is not an authorized procedural vehicle to challenge the competency of expert opinion testimony admitted without timely objection.

*Jones*, 270 Ga. App. at 487 (5).

On direct examination, Dr. Gluck indicated that the standard of care for placing a femoral catheter is the same regardless of the specialty of the placing physician, and the expert then explained the procedure and offered his opinion on how Dr. Bloom deviated from that standard. But on cross examination he provided testimony that indicated that he was unfamiliar with what emergency medicine physicians are being taught in residency programs and that his knowledge was based on the policies and procedures of the hospital where he is employed. Appellees raised no objection at this time, and Dr. Gluck's competency was unchallenged until Appellees moved for a directed verdict, arguing that Dr. Gluck, as a critical care doctor, was not qualified to

8

offer evidence regarding the standard of care for a femoral catheter placed by Dr. Bloom, an emergency medicine doctor. The trial court agreed and reasoned, based on Dr. Gluck's "equivocal" trial testimony, that his opinion was not "the product of reliable principles and methods . . . Nor can such varied principles and methods be applied 'reliably' to the facts of the case which had been admitted into evidence and placed before the jury as the trier of fact," citing OCGA § 24-7-702 (b) (2) and (3).

Here, there is not an absence of testimony on the essential element of the standard of care; but instead, conflicts in an expert's testimony that "go solely to the expert's credibility, and are to be assessed by the jury when weighing the expert's testimony." *Thompson v. Ezor*, 272 Ga. 849, 852 (2) (536 SE2d 749) (2000). See also *Swint v. Alphonse*, 348 Ga. App. 199, 205 (1) (820 SE2d 312) (2018). The record still contains evidence regarding the standard of care for the placement of a femoral catheter, and Dr. Gluck's opinions as to how Dr. Bloom breached that standard.[5] "[T]he trial court may not on motion for directed verdict . . . eliminate evidence on the ground that it was improperly received at the trial and then dispose of the case on

_____

[5] Our Supreme Court has disallowed the use of a motion to strike as "a procedural tool to object to evidence," except in limited instances in the context of criminal cases. *Sharpe v. DOT*, 267 Ga 267, 271 (2) (476 SE2d 722) (1996).

9

the basis of the diminished record." *Macon-Bibb County Bd. of Tax Assessors v. J.C. Penney Co.*, 239 Ga. App. 322, 323 (1) (a) (521 SE2d 234) (1999). "The record as it exists at the close of the trial controls as to whether the verdict should be directed and as to whether motion for judgment notwithstanding verdict should be granted." *Wooten v. Life Ins. Co. of Ga.*, 93 Ga. App. 665, 670 (92 SE2d 567) (1956). Compare *Rhoades v. McCormack*, 353 Ga. App. 635, 638-639 (1) (a) (839 SE2d 171) (2020) (directed verdict appropriate where appellant's expert failed to identify measures defendant should have taken that were consistent with the standard of care); *Newberry v. D.R. Horton, Inc.* 215 Ga. App. 858 (452 SE2d 560) (1994) (directed verdict appropriate where standard of care evidence was offered by witness that was never tendered as an expert by plaintiff).

It is clear from the trial court's order that the court entirely dismissed Dr. Gluck's testimony in ruling on the motion for directed verdict. A trial court is afforded wide discretion to determine the competency of expert witnesses. See *Ouanzin v. Coast Dental Servs.*, 354 Ga. App. 168, 173 (2) (840 SE2d 686) (2020). But neither the trial court nor Appellees cite any authority in support of the proposition that a trial court can selectively disregard unobjected to evidence when

10

considering a motion for directed verdict, and we are aware of none. Accordingly, we conclude that the trial court erred in directing a verdict in favor of Appellees.

2. In light of our decision in Division 1, we need not reach Appellant's remaining arguments.

*Judgment reversed and case remanded. Miller, P. J., and Hodges, J., concur.*